## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| EXCHANGE ROBOTICS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: |
| | ) | |
| v. | ) | **VERIFIED COMPLAINT** |
| | ) | **[DEMAND FOR JURY TRIAL]** |
| CHRISTOPHER R. FISHER, and | ) | |
| DOE DEFENDANTS 1-5, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Exchange Robotics, Inc., (hereinafter "Exchange" or "Plaintiff") hereby files this Complaint against Christopher R. Fisher (hereinafter "Fisher" or "Defendant"), Doe Defendants 1-5, and alleges the following:

## PARTIES

1. Plaintiff, Exchange Robotics, Inc., is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 600 Third Avenue, New York, New York.

2. Plaintiff is a leader in the development of financial artificial intelligence ("AI") software and provides AI software services to clients globally.  Plaintiff has devoted time and resources into developing competitive pricing information, sales strategies, client contract terms, and the subject software and platform, all of which contribute to Exchange's success and competitive edge in the industry.

3.  Defendant Christopher R. Fisher is a citizen of the State of New York, residing at 127 West 79th Street, New York, New York.  Defendant was previously employed by Plaintiff as Chief Product Officer.

4.  Plaintiff is currently unaware of the identity of one or more individuals or entities who may have knowingly acquired, used, or otherwise benefitted from Plaintiff's trade secrets and confidential information without authorization, including an unknown current or former employer of Defendant(s), or others acting in concert with them (collectively, "Doe Defendant(s) 1–5").

5.  Plaintiff therefore names these individuals or entities as fictitious defendants under the designation "Doe Defendant(s) 1–5." Plaintiff will seek leave to amend this Complaint to substitute their true names and capacities when they are ascertained through discovery. Plaintiff is informed and believes, and on that basis alleges, that each Doe Defendant is responsible, in whole or in part, for the acts, omissions, and damages alleged herein.

## JURISDICTION AND VENUE

6.  This civil action includes claims arising under the: Defend Trade Secrets Act of 2016, ("DTSA"), 18 U.S.C. § 1836(b)-(c), and the Computer Fraud and Abuse Act (CFAA) – 18 U.S.C. § 1030.  This civil action also includes claims involving misappropriation of trade secrets, violation of restrictive covenants, breach of contract, breach of non-disclosure agreement, unjust enrichment, tortious interference, unfair competition, and breach of fiduciary duty in violation of the laws of the State of New York.

7.  This Court has subject matter jurisdiction over Defendant Fisher pursuant to 28 U.S.C. §1331.

8. This Court has supplemental jurisdiction over Plaintiff's related state law claims, including claims for misappropriation of trade secrets, breach of contract, breach of fiduciary duty, tortious interference with contractual relations, and unfair competition, pursuant to 28 U.S.C. § 1367(a). These claims arise from the same common nucleus of operative facts as the federal claims and form part of the same case or controversy under Article III of the United States Constitution.

9. This Court has personal jurisdiction over Defendants pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and New York Civil Practice Law and Rules §§ 301 and/or 302. Upon information and belief, Defendant Fisher resides in the State of New York, regularly conducts business in the State of New York, and committed tortious acts within or directed to the State of New York which give rise to the claims set forth herein.

10. Any employment agreements between Plaintiff and Defendant do not contain a mandatory forum selection clause requiring exclusive adjudication in state court. To the extent such documents contain a permissive forum clause, venue in this federal district is proper and consistent with the parties' agreements.

## **FACTUAL BACKGROUND**

*Overview of the Industry and Exchange's Trade Secrets*

11. Exchange is an industry leader in the development and implementation Artificial Intelligence (AI) Services which are intended for use in the financial services market. The product and platform for these services is marketed by Exchange as "Scalata AI" (hereinafter referred to as "Scalata").

12. The following proprietary developed product is unique in its function and constitutes trade secrets owned and possessed by Exchange.

13. Scalata's computer-implemented system dynamically generates interactive user interface components—referred to as widgets—in response to natural language prompts.

14. The system includes a user interface for receiving user inputs, a generative AI agent that interprets those inputs to identify intent and data requirements, and a widget generation engine known as a Widget Farm. The system's function is unique and constitutes a trade secret owned and possessed by Exchange.

15. The Widget Farm constructs and deploys functional, data-driven UI widgets that are populated and updated based on structured or unstructured financial data. An orchestration agent coordinates interactions between AI agents, external data sources, and UI rendering layers, enabling real-time updates, personalization, and reuse of generated widgets. The system empowers non-technical users to create and configure dashboards and analytical tools on demand, without programming, supporting complex financial workflows through natural language interaction.

16. The complexity of developing AI services requires a wide range of proprietary information and techniques, not only relating to the platform, software, and AI services themselves, but also relating to design tools and techniques, and testing methodologies.

17. Over the past three years Exchange has invested substantial financial and capital resources in researching and developing advanced AI services intended for use in the financial services market.

18. The development and retention of confidential and proprietary information is critical to the success of Exchange's business and its competitive viability in the financial AI services market. Research and development of financial AI services is highly innovative and time consuming, due in part to the difficulty of conducting accurate experimentation and testing

of Large Language Models ("LLM") and results and assessing the accuracy of responses consistent with applicable financial or market information.  Consequently, confidential and proprietary information and trade secrets relating to financial AI services and platform design, research techniques, modeling and testing techniques, key designers, and business practices are among Exchange's most valuable assets.

19. As a result of Exchange's extensive investment in its research and development program, Exchange has been able to develop and take advantage of its confidential and proprietary information and trade secrets to improve its system and enhance their AI capabilities with respect to both data processing, quality of responses, synthesis of information, automation, and accuracy in emerging financial markets.  This costly and extremely difficult process has moved Exchange to the cutting-edge of technology in the marketplace and has enabled Exchange to achieve global recognition as an industry leader in financial AI services using the software, proprietary user interface, and components they have developed.

20. On the technical side, the confidential and proprietary information and trade secrets that Exchange seeks to protect include, at least in part, the following:

(a)    Scalata AI is a computer-implemented system which dynamically generates interactive user interface components—referred to as widgets—in response to natural language prompts. The system includes:

   a.   a proprietary user interface for receiving user inputs, which

      i.   allows users to save, clone, and apply previously generated widgets to new datasets through a no-code interface.

   b.   a user proxy agent configured to parse said input and determine intent;

c.  a generative AI agent that interprets those inputs to identify intent and data requirements;

d.  an assistant agent in communication with the user proxy agent and configured to:

   i.   identify one or more APIs to call based on said intent;

   ii.  call said APIs with required and optional parameters;

   iii. process responses from said APIs;

e.  the assistant referred to in subsection (d) proprietarily integrates with third-party data providers selected from the group consisting of Equifax, Tovo, and Morningstar;

f.  the assistant referred to in subsection (d) is proprietarily trained to detect user intent using a large language model (LLM) or a vector similarity-based memory store;

g.  a UI agent configured to update the interface in response to said responses;

   i.   wherein the system further comprises a generative AI model configured to perform entity extraction and financial calculations from said natural language input; and

   ii.  wherein said assistant agent is further configured to store analytical results in a structured format in a non-relational storage system.

h.  a widget generation engine known as a Widget Farm.

   i.   The Widget Farm constructs and deploys functional, data-driven UI widgets that are populated and updated based on structured or unstructured financial data.  The Widget Farm also dynamically

generate a user interface widget from the structured representation produced by the generative AI agent;

ii.  populate the widget with data retrieved from the data repository based on the user's intent;

iii.  enable interactive functionality including filters, selectors, and real-time data updates;

i.  An Orchestration agent which coordinates interactions between AI agents, external data sources, and UI rendering layers, enabling real-time updates, personalization, and reuse of generated widgets.  The Orchestration agent also:

1.  coordinates communication between the generative AI agent, the widget generation engine, and external data APIs;

2.  track user interactions with the generated widget to update personalization models and support further AI-assisted operations wherein the widget is rendered within a dashboard interface and is configurable, reusable, and modifiable by subsequent user input without requiring programming knowledge; and

3.  logs widget usage metrics and modifies future widget recommendations based on user behavior and interaction history.

ii.  The system empowers non-technical users to create and configure dashboards and analytical tools on demand, without programming,

supporting complex financial workflows through natural language interaction by using:

1. a widget generation engine which supports both static widget instantiation from predefined templates and dynamic widget synthesis based entirely on user prompts.

2. a generative AI agent which utilizes a large language model (LLM) and a retrieval-augmented generation (RAG) framework to enhance prompt interpretation and widget specification.

3. generated widgets which include interactive features selected from the group consisting of:

   a. sortable tables;

   b. drag-and-drop fields;

   c. visual charts;

   d. calculators;

   e. sliders;

   f. date pickers; and

   g. dynamic filtering options.

j. A computer-implemented system for generating interactive user interface components in response to natural language input, comprising:

   i. data ingestion module configured to receive and store structured or unstructured financial data in a data repository;

   ii. a user interface configured to receive natural language prompts from a user;

    iii.  a generative AI agent configured to:

        1.  interpret the natural language prompts to identify an intent and associated data requirements; and

        2.  construct a structured representation of a widget specification based on said intent, the data requirements, and a library of available interface functions.

    iv.  A generative AI agent configured to:

        1.  interpret the natural language prompts to identify an intent and associated data requirements;

        2.  construct a structured representation of a widget specification based on said intent, the data requirements, and a library of available interface functions.

(b)    The foregoing incorporates software codes and coding, proprietary design of each aspect of the product, and built software architectures, and other associated technical information.

21. These trade secrets are collectively referred to herein as "Exchange's Technical Trade Secrets."

22. Exchange also has a number of valuable commercial trade secrets that it seeks to protect including, at least in part, the following:

    a.  Information pertaining to the identity, position, and performance history of Exchange's engineers and other personnel, including organizational structure and personnel assignments;

b.  Product "roadmaps" containing projected release dates, performance expectations, and other key characteristics of Exchange's financial AI Services and Platform;

c.  Information pertaining to Exchange's pricing and/or cost information, including pricing and negotiation strategies, customer contract information, research and development expenditures, manufacturing expenditures, and profits.

d.  Management and business methods used by Exchange, including marketing and business plans and strategies;

e.  Identity of Exchange's actual and prospective customers;

f.  Identities of Exchange's vendors, and information pertaining to vendor qualifications, work product, and contracts;

g.  Exchange's compensation plan, including salary and incentive plan and related information;

h.  Exchange's phone lists and e-mail addresses;

i.  Lists of, or information relating to, employees and consultants of the Exchange (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants);

j.  Lists of, agreements with, or information relating to, suppliers and customers (including, but not limited to, customers of the Exchange on whom Fisher called or with whom Fisher became acquainted during the Relationship) and any other third parties, price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to Fisher during the course of his employment relationship with Exchange.

23. These trade secrets are collectively referred to herein as "Exchange's Commercial Trade Secrets."

24. Exchange's Technical and Commercial Trade Secrets are confidential, not known by others in the industry, and derive independent actual or potential commercial value precisely from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use.

25. Exchange has kept secret its Technical and Commercial Trade Secrets through means that are reasonable under the circumstances. This includes, but is not limited to, utilizing secure communications technology (Slack) to discuss relevant technical or commercial trade secrets, utilizing a secure web based platform which utilizes Git for version control and collaboration on software projects (GitHub), restricting the number of employees exposed to certain of its design and manufacturing processes, entering non-disclosure, licensing, or other agreements with vendors to protect its trade secrets, limiting access to its facilities, providing employees with badges to limit access, employing professional security firms, and requiring employees to sign confidentiality agreements.

26. In order to ensure Exchange's Technical and Commercial Trade Secrets are protected from disclosure to the general public, Exchange requires its employees to sign:

    a. An Employment Agreement;

    b. A Non-Disclosure Agreement; and

    c. A Confidential Information and Invention Assignment Agreement.

27. Exchange also obtains from each of its employees an assignment of all right, title and interest in and to inventions, discoveries, improvements, ideas, and other intellectual property developed or conceived by Exchange employees. Such intellectual property is

11

Exchange's proprietary information, remains Exchange's property, and no person or entity may use or otherwise disseminate it without Exchange's express permission to do so.

***Defendant Fisher's Intimate Knowledge of Exchange's Confidential Information and Trade Secrets and His Non-Disclosure and Confidentiality Agreements with Exchange***

28. Defendant Fisher is a former employee of Exchange.

29. Fisher began providing services in an advisory role to Exchange on or about May of 2024.

30. Prior to beginning his role as a trusted technical advisor, Fisher executed an Advisor Agreement which required him to not disclose services or proprietary confidential information. *See* Employment Agreements attached to the Affirmation of Bruno Lorenzelli, as Exhibit "A", at pages 8 through 10.

31. After providing services as a trusted advisor, Fisher began his employment with Exchange on or about July 10, 2024 as Exchange's Chief Product Officer. *See* Affirmation of Bruno Lorenzelli, *passim*.

32. In his trusted role as Chief Product Officer of Exchange, Fisher was given access to and entrusted with, substantially all of Exchange's Technical and Commercial Trade Secrets. Fisher knew well the competitive advantages Exchange enjoyed. He also knew the functions, strengths, and weaknesses of Exchange's key employees, including its engineers, administrators, researches, and business personnel.

33. In the course of his employment with Exchange, Fisher executed an Employment Agreement, a Confidential Information and Invention Agreement, a Non-Disclosure Agreement, and a Restricted Stock Agreement. He agreed and acknowledged that his employment would permit him access to Exchange's trade secrets and confidential business and supplier/customer information on the condition that those trade secrets and confidential business and supplier/customer information would not be improperly disclosed. Fisher

further gave up any rights to, and agreed to protect, any proprietary information and Exchange's trade secrets.    *See* Affirmation of Bruno Lorenzelli, *passim*.

34. The subject Employment Documents contain provisions which set forth the parties' agreed upon employee duties, obligation to protect and preserve confidential information, and to abide by restrictive covenants. *See* Affirmation of Bruno Lorenzelli, *passim*.

35. Upon beginning his employment relationship with Exchange in 2024, Fisher gained access to Exchange's confidential information, including trade secrets.  Fisher had access to Exchange's confidential information on his personal devices (*e.g.*, laptop, cell phone), on Fisher's desktop computer.

36. In his trusted role as Chief Product Officer, Fisher had overall authority and responsibility for product development and management, including overseeing all stages of product development and ensuring timely delivery of the products.  *See* Affirmation of Bruno Lorenzelli, *passim*.

37. Exchange's confidential information is in the form of, among other things, Word documents, Excel spreadsheets, databases, software applications, proposal materials, notes, Slack data and messages, GitHub messages and data, and emails.

38. In addition to open access to Exchange's confidential information and the general requirements of his employment as Exchange's Chief Product Officer, Defendant Fisher was routinely involved in the marketing and sale of Scalata to various potential clients.  *See* Relevant Email Communications, attached as Exhibit "B" to Affirmation of Bruno Lorenzelli as Exhibit "B", at pages 2 through 4, 7 through 12, and 14.

39. Significantly, Defendant Fisher was intimately involved in the development of marketing tools, demonstrations of the product's capability, the development of client use cases for

client consideration in the sales process, and the compilation of client lists for furtherance of sales and development efforts at Exchange. *Id.*

40. Defendant Fisher also attended sales conferences as a representative of Exchange and benefitted from specific client lists, marketing information, and marketing strategies which were proprietary to Exchange. *Id.*

41. The available Employment Documents demonstrate that Fisher agreed that he would hold any and all Confidential Information that he obtained, accessed, or created during his employment in strictest confidence, that he would not use such Confidential Information except for Exchange's benefit and to the extent necessary to perform his obligations to Exchange in connection with his employment, and that he would not disclose such Confidential Information to any third party without written authorization from Exchange in each instance. *See* Affirmation of Bruno Lorenzelli, *passim*.

42. Fisher further acknowledged that the duties he performed for Exchange were of a special and unique character, that he would obtain knowledge and skill relevant to Exchange's industry, methods of doing business, and marketing strategies by virtue of his employment. *See* Affirmation of Bruno Lorenzelli, *passim*.

43. Fisher further acknowledged (after having the opportunity to seek the advice of independent legal counsel) that violation of his Employee Confidential Information and Invention Assignment Agreement would cause Exchange irreparable harm and that Exchange would be entitled to seek extraordinary relief in court, including "temporary restraining orders, preliminary injunctions, and permanent injunctions…." *See* Affirmation of Bruno Lorenzelli, *passim*.

44. Fisher also agreed that "in the event of a breach or threatened breach of this Agreement, the Company, or any of its successors or assigns may, in addition to other rights and remedies existing in their favor at law or in equity, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of such provisions (*without posting a bond or other security*)." *See* Affirmation of Bruno Lorenzelli, *passim*.

45. Exchange takes careful measures to ensure that its Confidential Information remains secret. Those measures are set forth (in part) in the attached Information Security Policy document. *See* Information Security Policy document attached to Affirmation of Bruno Lorenzelli as Exhibit "C".

46. Pursuant to memorialized company policy, Exchange closely monitors which Exchange employees have access to confidential information and trade secrets, as well as what specific categories of confidential information each Exchange employee has access to.

47. Exchange requires each employee to execute a confidentiality agreement to ensure proprietary information, confidential information, and trade secrets are protected from improper disclosure.

***Defendant Fisher's Credible Indications of Intent to Misappropriate Proprietary Information, in Violation of Company Policies and Fiduciary Duty.***

48. During the course of Fisher's employment, he was tasked with advancing Exchange's operations goals in establishing a DataBricks solution. *See* Affirmation of Bruno Lorenzelli, Termination Letter attached as Exhibit "D".

49. Defendant Fisher was unable to achieve this goal during the course of his employment. *Id.*

50. Additional indications of Fisher's intent to misappropriate proprietary information in violation of company policy and his fiduciary duty are included below:

a. Demonstrated repeated lapses in compliance with internal confidentiality and information security protocols;

b. Exhibited behavior suggesting potential misuse or improper retention of proprietary company materials, currently under internal review;

c. Displayed significant and sustained decline in quality and timeliness of deliverables, inconsistent with prior performance;

d. Failed to follow established procedures regarding access to and distribution of sensitive client data; and

e. Was observed attempting to duplicate or export internal databases without authorization; incident reported for further investigation.

51. In addition to the foregoing and his failure to meet necessary operational goals, Defendant Fisher contributed to a negative work environment by disparaging the company and its leadership in pursuing the company objectives during the course of his employment, to the detriment of Exchange. *See* Exhibit "D" to Affirmation of Bruno Lorenzelli.

52. Based upon his failure to meet Exchange's operational goals and contribution to a negative work environment, Defendant Fisher was terminated from his employment with Exchange on or about April 2, 2025. *Id.*

53. As part of his termination notice, Defendant Fisher was directed to return all Company property, including identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, electronically stored documents or files, physical files, and any

54. Further, as part of his termination, he was reminded of his obligations to maintain the confidential nature of Exchange's Technical and Commercial Trade Secrets.

**Defendant Fisher's Failure to Fulfill His Post Employment Obligations**

55. On April 2, 2025, Fisher contacted Exchange's President, Bruno Lorenzelli (hereinafter "President") to discuss wrapping up his employment with Exchange. *See* Affirmation of Bruno Lorenzelli, Exhibit "B", at page 20.

56. During the course of their email exchange Fisher and President discussed a Fisher's post-employment obligations. *Id.*, at pages 15 through 27.

57. Fisher and Exchange also discussed his post-employment obligation to return company property, to refrain from representing himself as a current employee of Exchange, and to maintain the confidential nature of information provided to him during the course of his employment. *Id.*

58. Despite Exchange's request that Fisher return company equipment, refrain from representing himself as a current employee of Exchange, and to maintain the confidential nature of information provided to him during the course of his employment, Defendant Fisher has refused to cooperate with Defendant Exchange's requests. *See* Screenshot of LinkedIn Profile of Christopher R. Fisher, attached to Affirmation of Bruno Lorenzelli as Exhibit "E".

**Exchange's Irreparable Harm**

59. Upon information and belief and despite his awareness of his post-employment obligations, Defendant Fisher has refused to comply with Exchange's requests to return company property and to refrain from representing himself as a current employee of Exchange.

60. Upon information and belief and despite his express agreement to protect the confidential information and trade secrets provided to him during his employment with Exchange, Exchange reasonably believes Defendant Fisher is pursuing and/or currently working for

company(ies) in the same, or substantially the same, capacity in which he previously served Exchange.

61. As a direct result of Defendant Fisher's failure to adhere to his post-employment obligations, Exchange has been damaged by the loss of confidential information and trade secrets which inevitably will be used by competitors to Exchange's detriment.

**COUNT I**
**(Trade Secrets Misappropriation Under the Defend Trade Secrets Act of 2016)**

62. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

63. Plaintiff, in the course of the operation of its business, owned Technical and Commercial Trade Secrets including, but not limited to, the Technical and Commercial Trade Secrets previously described above.

64. Plaintiff's Technical and Commercial Trade Secrets is currently, and was at the time of Fisher's misappropriation, secret. All individuals with access to Exchange's Technical and Commercial Trade Secrets were instructed to protect it, and they were subject to obligations to keep Exchange's Confidential Information secret. Additionally, Exchange's Technical and Commercial Trade Secrets is not generally known to the public or to other persons who can obtain economic value from its disclosure or use. Exchange's Technical and Commercial Trade Secrets are not readily ascertainable by the public or to other persons.

65. Exchange's Technical and Commercial Trade Secrets have actual and potential independent economic value because it is not generally known. The actual and potential economic value of Exchange's Confidential Information is derived from not being generally known because it gives Exchange an actual and potential business advantage over

others who do not know the information and who could obtain economic value from its disclosure or use.

66. Plaintiff, in the course of the operations of its business, undertook efforts to protect its trade secrets, including but limited to requiring employees to protect and maintain the secrecy of its Technical and Commercial Trade Secrets.

67. Defendant, in his trusted role as Chief Product Officer, became aware of Plaintiff's Technical and Commercial Trade Secrets.

68. Upon information and belief, Fisher disclosed Exchange's Technical and Commercial Trade Secrets, without Exchange's consent, to individuals within Exchange's industry.

69. As a direct result of Defendant's misappropriation of Technical and Commercial Trade Secrets, Plaintiff has been irreparably harmed. Exchange will continue to be irreparably harmed unless Fisher is enjoyed from further use and disclosure of Exchange's Technical and Commercial Trade Secrets.

70. Fisher's wrongful misappropriation of Exchange's Technical and Commercial Trade Secrets was, and continues to be, willful and malicious, and warrants an award of reasonable attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D), and exemplary damages, as provided by 18 U.S.C. § 1836(b)(3)(C).

## COUNT II
### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*)

71. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

72. Defendant Fisher, illegally, improperly, and intentionally accessed Plaintiff's Technical and Commercial Trade Secrets via his personal devices and work desktop without and/or in excess of the authorization of Exchange for the purpose of illegally accessing confidential,

proprietary, and trade secret business information, private and confidential personal information, and attorney-client privileged communications maintained by Exchange.

73. The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et. seq.*, prohibits Defendant from intentionally accessing a computer without authorization, or exceeding authorized access, and thereby obtaining information from any protected computer that is used in and/or affects interstate commerce and communication.

74. The documents and information maintained by Exchange, including the stolen information, were electronically stored using Slack, Github, Microsoft Office Applications (Word, Excel, Powerpoint), on a protected computer that is used in and/or affects interstate commerce and communication.

75. Accordingly, Defendant's conduct, set forth in more detail above, constitutes multiple violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et. seq*.

76. Plaintiff has been and continues to be damaged by Defendant's conduct.

77. Based upon the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus interest and all other available forms of relief.

<u>**COUNT III**</u>
**(Trade Misappropriation under the Laws of the State of New York)**

78. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

79. In addition to violating the Trade Secrets Misappropriation Under the Defend Trade Secrets Act of 2016, Defendant Fisher's wrongful and improper use of confidential and proprietary trade secrets is also violative of the laws of the State of New York.

80. Plaintiff, in the course of the operation of its business, owned trade secrets including, but not limited to, the Technical and Commercial Trade Secrets previously described above.

81. Plaintiff's Technical and Commercial Trade Secrets are currently, and was at the time of Fisher's misappropriation, secret. All individuals with access to Exchange's Technical and Commercial Trade Secrets were instructed to protect it, and they were subject to obligations to keep Exchange's Confidential Information secret. Additionally, Exchange's Technical and Commercial Trade Secrets are not generally known to the public or to other persons who can obtain economic value from its disclosure or use. Exchange's Technical and Commercial Trade Secrets are not readily ascertainable by the public or to other persons.

82. Exchange's Technical and Commercial Trade Secrets have actual and potential independent economic value because it is not generally known. The actual and potential economic value of Exchange's Technical and Commercial Trade Secrets are derived from not being generally known because it gives Exchange an actual and potential business advantage over others who do not know the information and who could obtain economic value from its disclosure or use.

83. Plaintiff, in the course of the operations of its business, undertook efforts to protect its trade secrets, including but limited to requiring employees to protect and maintain the secrecy of its Technical and Commercial Trade Secrets.

84. Defendant, in his trusted role as Chief Product Officer, became aware of Plaintiff's Technical and Commercial Trade Secrets.

85. Upon information and belief, Fisher disclosed Exchange's Technical and Commercial Trade Secrets, without Exchange's consent, to individuals within Exchange's industry.

86. As a direct result of Defendant's misappropriation of trade secrets, Plaintiff has been irreparably harmed. Exchange will continue to be irreparably harmed unless Fisher is

enjoyed from further use and disclosure of Exchange's Technical and Commercial Trade Secrets.

## COUNT IV
### (Breach of Contract)

87. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

88. The subject executed Employment Documents constitute valid and enforceable contractual agreements which were supported by consideration in the form of continued employment and compensation (including salary, bonuses, and stock options).

89. Exchange satisfactorily performed all of its obligations under the terms of the subject agreement.

90. Despite Exchange's performance and upon information and belief, Defendant Fisher substantively and materially breached and is in continuous breach of the subject Employment Agreements.

91. As a direct result of Defendant Fisher's breach of the subject Employment Agreements, Plaintiff has been caused to suffer compensatory damages and economic harm.

## COUNT V
### (Unjust Enrichment)

92. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

93. As a direct result of Defendant Fisher's wrongful disclosure of confidential information and trade secrets, he has received a benefit.

94. The benefit derived by Defendant Fisher was obtained at Plaintiff's expense.

95. As a direct result of Defendant Fisher's wrongful disclosure of confidential information and trade secrets, Plaintiff has suffered compensatory damages and economic harm.

## COUNT VI
### (Breach of Fiduciary Duty)

96. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

97. A fiduciary relationship existed between Exchange and Defendant Fisher due to the terms of his employment and special position of trust as Chief Product Officer.

98. As part of the fiduciary relationship between Exchange and Defendant Fisher, Defendant Fisher owed a duty of loyalty to Exchange.

99. Defendant Fisher's wrongful disclosure of Confidential Information and proprietary trade secrets which were obtained during employment was contrary to the interests of Exchange, violative of the duty of loyalty owed by Defendant Fisher, and violative of the parties' express agreement.

100.    As a direct result of Defendant Fisher's wrongful disclosure of confidential information and trade secrets, Plaintiff has suffered compensatory damages and economic harm.

## COUNT VII
### (Tortious Interference)

101.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

102.    At all relevant times, Plaintiff had a valid and enforceable Confidentiality, Non-Disclosure, and Employment Agreements with Defendant Fisher, which Defendant knowingly entered into as a condition of their employment with Plaintiff.

103.     The Agreements prohibited Defendant Fisher from disclosing Plaintiff's confidential and proprietary information, including but not limited to trade secrets, client lists, pricing strategies, and internal business processes, during and after the term of Defendant's employment.

104.     Upon information and belief, Fisher is or intends to engage in communications with Exchange's customers in a manner designed to interfere with Exchange's contractual relationships and business expectancies, including efforts that may deprive Exchange of the benefit of its existing contracts.

105.     As a direct and proximate result of the foregoing acts, Plaintiff has suffered and continues to suffer irreparable harm, including but not limited to loss of business, dilution of proprietary information, unfair competition, and damage to its relationships with existing and prospective clients.

106.     Plaintiff has no adequate remedy at law and seeks injunctive relief, as well as compensatory and punitive damages in an amount to be determined at trial.

## COUNT VIII
### (Unfair Competition)

107.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein at length.

108.      Plaintiff has invested substantial time, effort, and resources in developing its confidential and proprietary business information, referred to above as Technical and Commercial Trade Secrets.

109.     This Confidential Information derives independent economic value from not being generally known to the public or to Plaintiff's competitors and is the subject of reasonable

efforts by Plaintiff to maintain its secrecy, including through the use of confidentiality and non-disclosure agreements with its employees.

110.    Defendant Fisher, while employed by Plaintiff as Chief Product Officer, had access to and became familiar with Plaintiff's Confidential Information and was contractually and legally obligated to maintain the confidentiality of such information.

111.    Upon information and belief, Defendant misappropriated Plaintiff's Confidential Information and is now using it in her/his/their current employment or business relationship with ABC Corp., a direct competitor of Plaintiff.

112.    Upon information and belief, ABC Corp., knowingly accepted and is unlawfully benefiting from Plaintiff's Confidential Information, which was wrongfully obtained from Defendant, in bad faith and with the intent to gain a commercial advantage and damage Plaintiff's business.

113.    The actions of Defendant and ABC Corp. constitute unfair competition under New York common law, including the misappropriation of Plaintiff's proprietary business information and the unauthorized exploitation of Plaintiff's labor, skill, and expenditures for their own gain.

114.    As a direct and proximate result of the above conduct, Plaintiff has suffered and continues to suffer irreparable harm, including the loss of competitive advantage, customer goodwill, and business opportunities.

115.    Plaintiff has no adequate remedy at law and seeks both injunctive relief and monetary damages, including punitive damages for Defendants' willful and malicious misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

a.  Enjoining and restraining Defendant Fisher and all persons or entities acting in concert with him from performing any employment duties for a person or company which functions or operates in the same or substantially similar market as Exchange;

b.  Enjoining and restraining Defendant Fisher and all persons or entities acting in concert with him from violating any legal and contractual duties to Exchange, from using any of Exchange's Confidential Information or trade secrets, and order the return of any of Exchange's property;

c.  Enjoining and restraining Defendant Fisher from representing himself as employed by Exchange;

d.  Enjoining and restraining Fisher from destroying, modifying, or deleting any potentially relevant physical or electronic writings, recordings, data, correspondence, communications, or evidentiary materials;

e.  Entering orders and preliminary injunctions requiring such affirmative acts as are appropriate to protect Exchange's trade secrets and contractual rights, including but not limited to order the return of all of Exchange's property and providing access to Defendant Fisher's computer, desktop, and electronic devices for imaging by Exchange;

f.  Entering orders and preliminary injunctions requiring physical turnover of Defendant Fisher's computer, desktop, and electronic devices for personal inspection by Exchange;

26

g.  Entering orders and preliminary injunctions requiring such affirmative acts as are appropriate to ensure all confidential information, Technical and Commercial Trade Secrets are returned to Plaintiff;

h.  Ordering Defendant Fisher to account for and pay to Exchange all gains, profits, and savings derived from their improper conduct;

i.  Ordering Defendant Fisher to pay Exchange the damages sustained by Exchange as a result of Defendants' unlawful acts, including all damages measured by the value of the benefit obtained by Defendants and damages as provided by agreement or law;

j.  Ordering Defendants to pay exemplary and punitive damages in an amount sufficient to punish Defendant and to deter similar conduct in the future;

k.  Ordering Defendants to pay attorneys' fees and all other costs Exchange incurred in this action; and

l.  Awarding such other relief as the Court deems just and necessary.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Exchange demands trial by jury in this action of all issues so triable.

DATED this 23rd day of July, 2025.

The Bayne Law Group, LLC
Counsel for Plaintiff, Exchange Robotics, Inc.

By: /s/ Andrew J. Bayne_____
Andrew J. Bayne, Esq.
Thomas E. Lamb, Esq.
230 Park Avenue, Suite 1000
New York, New York 10169
Telephone: (212)679-2205

Facsimile: (212)679-2208
Email: abayne@baynelaw.com

## **VERIFICATION**

STATE OF NEW YORK    )

                         SS.

COUNTY OF NEW YORK   )

I, Bruno Lorenzelli, being duly sworn, hereby state:

1. I am President of Exchange Robotics, Inc. and am authorized to verify the foregoing Complaint.

2. I have read the foregoing complaint and the averments contained therein, and verify that they are true and correct to the best of my information, knowledge, and belief.

3. I affirm this __23__ day of July 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law

Bruno Lorenzelli